UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

EDWIN LOPEZ,

                Plaintiff,

    v.

BURRIS LOGISTICS CO.,

                Defendant.

No. 3:12 - CV - 1039 (CSH)

JULY 3, 2013

<u>RULING ON DEFENDANT'S MOTION TO DISMISS</u>

<u>**HAIGHT, Senior District Judge**</u>:

I.    <u>**INTRODUCTION**</u>

       In this consolidated action, plaintiffs Edwin Lopez, Richard Lester, Ryan Montalvo, and Jonathan Valdes (collectively "Plaintiffs") seek recovery from their former employer, defendant Burris Logistics, Inc. ("Burris" or "Defendant"), for their wrongful terminations on February 21, 2012.[1]  Pending before the Court is Defendant's motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Count Two of each of Plaintiffs' Complaints, which sets forth a wrongful discharge claim in violation of public policy.  Doc. #16.  Defendant contends that each wrongful discharge claim should be dismissed as "legally insufficient on the ground that an alternate remedy exists under Conn. Gen. Stat. § 31-51q" and such a statutory claim "has, in fact been pled in Count Three, thereby

---

    [1]  The caption of the Complaint in this action names the Defendant as "Burris Logistics *Co.*"  The Defendant, however, refers to itself in these proceedings as "Burris Logistics, *Inc.*"  Therefore, despite conforming to the caption of the formal docket, the Court recognizes Burris Logistics, Inc. as defendant in this Ruling.

precluding the [P]laintiffs from bringing a wrongful discharge claim under Connecticut common[] law." Doc. #17, p. 1.

Plaintiffs object to the motion, arguing that they "are entitled to plead alternative and inconsistent causes of action." Doc. #23-1, p. 3. They reason that "[t]his is because when the factual allegations of each specific case are developed, they may render the statutory causes of action unavailable." *Id.*, p. 3. "If and when that occurs, the bar to the plaintiff[s'] common law claims will cease to exist, and the plaintiff[s] will be entitled to pursue them." *Id.*

Furthermore, Plaintiffs rely on the Connecticut Supreme Court's decision in *Schumann v. Dianon Systems, Inc.* 304 Conn. 585 (2012), in which the "Court overturned the jury's verdict on the plaintiff's § 31-51q claim," and then "remanded the case for a new trial on the plaintiff's common law wrongful discharge claim." Doc. #23-1, p. 4. Plaintiffs read that decision as validating alternative pleading of statutory and common law wrongful termination claims. *Id.*

The Court will resolve the motion, and thus the conflicts with respect to the parties' legal arguments, in Part IV. below.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Consolidation

On July 16, 2012, plaintiff Edwin Lopez initiated the present action against his former employer, Burris Logistics, Inc., alleging that he was wrongfully terminated on February 21, 2012. Case No. 3:12cv1039 (CSH), Doc. #1, ¶ 54. The next day, on July 17, 2012, Lopez's counsel commenced three separate wrongful termination actions by other former employees against Burris. *See Richard Lester v. Burris Logistics Co.*, No. 3:12cv1041 (RNC); *Ryan Montalvo v. Burris*

*Logistics Co.*, No. 3:12cv1044 (WWE), and *Jonathan Valdes v. Burris Logistics Co.*,   No. 3:12cv1045 (RNC).

On August 17, 2012,   counsel for Burris, Ian T. Clarke-Fisher of Robinson & Cole, LLP, filed an identical "Unopposed Motion to Consolidate" in each of the four cases, seeking consolidation for purposes of pre-trial proceedings and discovery, pursuant to Fed. R. Civ. P. 42(a).[2] *See* No. 3:12cv1039, Doc. #8; No. 3:12cv1041, Doc. #8; No. 3:12cv1044, Doc. #7; and No. 3:12cv1045, Doc. #9.  Burris based each motion on the grounds that "the four above-titled actions all arise from the same incident, name Burris as the sole defendant, hinge on the same set of central facts, involve many of the same witnesses[,] including each of the [P]laintiffs, and encompass common issues of law." *See, e.g.*, No. 3:12cv1039, Doc. #9, p. 2, ¶ 1.  "Due to their factual and legal overlap, and in the interests of judicial economy," Burris "request[ed] that this Court consolidate the [four referenced] actions into a single unified set of proceedings for the purposes of pre-trial proceedings and discovery." *Id.*  Although Burris did not move to consolidate the matters for purposes of trial, in a footnote it explicitly "reserve[d] the right" to do so at a later time. *Id.*, p. 2 n.1.

As the Second Circuit explained in *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990), *cert. denied*, 498 U.S. 920 (1990), "Rule 42(a) of the Federal Rules of Civil Procedure empowers a trial judge to consolidate actions for trial when there are common questions of law or fact to avoid unnecessary costs or delay."  Recognizing Rule 42(a) "as a valuable and important tool

---

[2]  In addition to captioning its motion as "Unopposed," Burris asserted in its supporting memorandum that "[P]laintiffs' counsel ha[d] substantially consented to the granting of said motion." *See, e.g.*, No. 3:12cv1039, Doc. #9, p. 5, para. 2.  Burris offered no details, elaboration or proof of said consent; nor did Plaintiffs provide the Court with independent confirmation of consent. In any event, none of the Plaintiffs filed an objection to the motions to consolidate.

of judicial administration" in the case at bar, this Court exercised its discretion to grant the motion, thereby "invok[ing] [Rule 42(a)] to . . . eliminate unnecessary repetition and confusion," *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999).[3] The cases were thus consolidated for pre-trial proceedings and discovery under docket number 3:12cv1039, *Lopez v. Burris Logistics Co.,* the lead case. Accordingly, the Court interprets Burris's motion to dismiss (Doc. #16), pending on the consolidated docket sheet, as addressed to all four Plaintiffs' Complaints.[4]

### B.   Factual Summary of Consolidated Actions

Defendant Burris "operates a refrigerated warehouse in Rocky Hill, Connecticut." Doc. #17, p. 2. According to Burris, "[m]anufacturers of refrigerated and frozen food products, such as milk, yogurt, and ice cream, deliver their products to the [Rocky Hill] warehouse and are placed onto stacks." *Id.* "Retailers submit purchase orders to Burris and warehouse personnel select and load the identified merchandise onto pallets for shipment to the retailers." *Id.* In their former employment positions with Burris, Plaintiffs were allegedly "responsible for selecting and loading food onto the pallets for shipment to retailers." *Id.*

Specifically, Plaintiffs held the following positions with Burris: Edwin Lopez – Incentive Selector (July 25, 2011 to February 21, 2012), No. 3:12cv1039; Doc. #1 at ¶¶ 6-7; Richard Lester

---

[3]   In granting the motion to consolidate, the Court expressed no view "as to whether at a later stage of litigation these four cases should be consolidated for any or all other purposes, including trial." Doc. #11. Any "additional consolidation would require a further order of the Court under Rule 42(a)." *Id.*

[4]   The Court's citations to docket entries herein are those appearing on the docket of the *Lopez* or lead case, 12cv1039, unless otherwise noted.

4

– Backhauler/Unloader (August 18, 2009 to February 21, 2012), No. 3:12cv1041, Doc. #1, ¶¶ 6-7; Ryan Montalvo – Incentive Selector who occasionally performed the duties of Incentive Lift Operator and Incentive Loader (October 1, 2008 to February 21, 2012), No. 3:12cv1044, Doc. #1, at  ¶¶ 6-7; and Jonathan Valdes – Incentive Selector and Incentive Lift Operator (August 18, 2008 to February 21, 2012), No. 3:12cv1045,  Doc. #1,  at  ¶¶ 6-7.

According to Plaintiffs, Burris employed a "malleable time management system" to calculate incentive pay, utilizing variable rates of pay based on various factors.  *See, e.g.*,  No. 3:12cv1039, Doc. #1, at ¶10.    Plaintiffs each alleged that during certain periods of their employment they did not receive the full amount of compensation due from Burris.  *See, e.g.*, *id.,* at ¶¶ 34-36.  Each complained to Burris supervisors and/or the general manager at the Rocky Hill warehouse regarding such payment issues.  *Id.*, at ¶¶ 37-39.

All four Plaintiffs were terminated on February 21, 2012, one day following a water main break at the Rocky Hill warehouse, causing water to cover and freeze upon the warehouse floor.  *See* No:12cv1039, Doc. #1, at ¶¶ 42-54; No. 3:12cv1041, Doc. #1, at ¶¶ 47-59; No. 3:12cv1044, Doc. #1, at ¶¶ 57-76; and No. 3:12cv1045, Doc. #1,  at  ¶¶ 55-73.  In particular, the leaking water "turned to ice in the freezer area of the warehouse." No. 3:12cv1039, Doc. #1, at ¶ 43; No. 3:12cv1041, Doc. #1,  at ¶ 48;   No.3:12cv1044, Doc. #1, at ¶ 58; No. 3:12cv1045, Doc. #1,  at ¶ 56.  Two Burris supervisors, Xavier Gomez and Christopher Costa, allegedly "asked for volunteers to help remove water from the warehouse*." See, e.g.*, No. 3:12cv1039, Doc. #1, at ¶¶ 45-46.    Thereafter, a supervisor named Dexter Lee allegedly ordered the Plaintiffs to chip ice from the freezer area of the employer's warehouse.  *Id*., ¶ 52.

Two of the four plaintiffs, Lopez and Lester, assert that they complied with Lee's request to

5

chip ice.  No. 3:12cv1039, Doc. #1, at ¶ 53; 12cv1041, Doc. #1,  at ¶ 58.  Plaintiffs Montalvo and

Valdes, however, refused to chip ice based on their concerns about safety and belief that such

chipping was not within their job descriptions.   No. 3:12cv1044, Doc. #1,  at ¶¶ 67-68; No.

3:12cv1045, Doc. #1, at ¶¶ 66-67.[5]  All Plaintiffs noted to their fellow employees that the removal

of the water "seemed unsafe" because in the past, whenever a spill in the warehouse occurred, the

custom and practice was to put cones around the spill and to tape off that area until it could be

mopped and cleaned so that employees did not slip." No. 3:12cv1039, at ¶ 49; No. 3:12cv1041, Doc.

#1,  at ¶ 54;   No.3:12cv1044, Doc. #1, at ¶ 64; No. 3:12cv1045, Doc. #1,  at ¶ 62.

The next day  Burris terminated all four Plaintiffs "and several other [Burris] employees,"

allegedly using "the incident involving the water main as a pretext to terminate a number of

employees [whom Burris]  desired to terminate." *See, e.g.*, No. 3:12cv1039, Doc. #1, at ¶ 56.

Specifically, according to Plaintiffs, Burris terminated them "on the pretext that [each] refused an

order to remove water from the warehouse."  No. 3:12cv1039, Doc. #1, at ¶ 54; No. 3:12cv1041,

Doc. #1, at ¶ 59; No. 3:12cv1044, Doc. #1, at ¶ 75; and No. 3:12cv1045, Doc. #1,  at ¶ 72.

Plaintiffs maintain that Burris utilized the water main break "to cover its true motivations,

which were illegal" – namely, retaliation for Plaintiffs' complaints regarding "wage violations,"

"safety problems," and "sexual harassment."  No. 3:12cv1039, Doc. #1, at ¶ 56; No. 3:12cv1041,

---

[5]  Plaintiffs Montalvo and Valdes both  replied to supervisor Lee by stating that they
preferred not to chip ice in the freezer because their steel toed boots, which were mandatory for their
lift operator positions,  did not have any spikes or grips to prevent the soles from slipping on the ice.
No. 3:12cv1044, Doc. #1, at ¶ 68; No. 3:12cv1045, Doc. #1, at ¶ 66.  They also told the shipping
manager, Michael Wingate, that they did not want to chip ice because the "ice chipping assignment
was [not] within [their] job description as selector[s]."  No. 3:12cv1044, Doc. #1,  at ¶ 70;  No.
3:12cv1045, Doc. #1,  at ¶ 67.   Instead of giving Valdes and Montalvo other work assignments,
Defendant told them both to "punch out" for the day.  No. 3:12cv1044, Doc. #1, at ¶¶ 72-74; No.
3:12cv1045, Doc. #1,  at ¶¶ 68-71.

Doc. #1,  at ¶ 61; No. 3:12cv1044, Doc. #1, at ¶ 77; and No. 3:12cv1045, Doc. #1,  at ¶ 74.[6]

In July of 2012, approximately five months after Plaintiffs were discharged, Attorney Michael Petela, Jr. of Cicchiello & Cicchiello, LLP, commenced a  separate action for each Plaintiff in the United States District Court for the District of Connecticut.  Each complaint set forth the following four claims: (1) employment retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215, *et seq.*; (2) common law wrongful discharge in violation of public policy; (3) wrongful termination in violation of Connecticut's "free speech" statute, Conn. Gen. Stat. § 31-51q; and (4) breach of the implied covenant of good faith and fair dealing. In addition to these four claims, plaintiff Jonathan Valdes included an action for discrimination and retaliation in violation of the Connecticut Workers' Compensation Act, Conn. Gen. Stat. § 31-290a, *et seq*.  No. 3:12cv1045, Doc. #1 (Count 5).   In all four actions, now consolidated for pre-trial and discovery, jurisdiction of the Court was invoked pursuant to "federal question" jurisdiction, 28 U.S.C. §1331, due to the Plaintiffs' inclusion of the FLSA  claim, which patently arises under federal statute.

As described *supra*, Burris's pending motion to dismiss (Doc. #16) seeks dismissal of Count Two of each Complaint – common law wrongful discharge in violation of public policy[7].  Burris claims that because there is an alternative statutory remedy, Conn. Gen. Stat. § 31-51q, under which Plaintiffs have asserted a claim in Count Three of each Complaint, Plaintiffs are precluded from bringing their common law wrongful discharge claims.  Defendant thus requests that the Court strike

---

[6] Plaintiffs have not detailed specific factual circumstances of  sexual harassment by Burris in any of the four Complaints.  Therefore, the Complaints do not describe the substance or basis of the sexual harassment complaints Plaintiffs allegedly made to Burris management.

[7] Burris clarifies that "although filed separately," Plaintiffs' Complaints "are all identical for the purposes of this motion and thus [are] treated together."  Doc. #17, p. 1 n.1.

Count Two from each of the four Complaints "as legally insufficient on the grounds that an alternate remedy exists under Conn. Gen. Stat. § 31-51q."   Doc. #17, p. 5.

## III.   STANDARD OF REVIEW - RULE 12(b)(6) MOTION TO DISMISS

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678  (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.   The Second Circuit has consistently adhered to the United States Supreme Court's seminal "plausibility" standard set forth in *Iqbal*.[8]  *See In re Terrorist Attacks on September 11, 2001,* 714 F.3d 118, 122 (2d Cir. 2013); *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir.  2013); *Absolute Activist Value Master Fund, Ltd. v. Ficeto*, 677 F.3d 60, 65  (2d Cir. 2012).

"[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'" *Halebian v. Berv*,  644 F.3d 122, 130  (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir.2006) (emphasis omitted)).[9]  "In ruling on a motion pursuant to Fed.R.Civ.P. 12(b)(6), the duty of a court

---

[8]  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*,  556 U.S. at 678. Thus, "[w]here  a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (brackets omitted)).

[9]  Rule 8 of the Federal Rules of Civil Procedure mandates that a complaint "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.

is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.*"  DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (citation and internal quotation marks omitted)).   "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim[]. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)*. Accord Walker v. Schult*, No. 12-1806-cv, __ F.3d __, 2013 WL 2249159, at *3 (2d Cir. May 23, 2013).

In deciding whether to grant a Rule 12(b)(6) dismissal,  the court "constru[es] the complaint liberally, accepting all [well-pleaded] factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chase Grp. Alliance LLC v. N.Y.C. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010) (internal quotations and citation omitted).  *See also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).   "[W]hether a complaint states a plausible claim for relief  will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 663-64.  When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  556 U.S. at 679.  Thus, factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012)

---

P. 8(a)(2).  The pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

(quoting *Iqbal*, 556 U.S. at 678).   *See also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x  52, 54 (2d Cir. 2011) (same).    The Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir.2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir.2008) (internal quotation marks omitted)).   It thus follows that "[t]hreadbare  recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).   Rule 8 of the Federal Rules of Civil Procedure simply "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

## IV.   DISCUSSION

### A.    Wrongful Discharge in Violation of Public Policy

Connecticut recognizes a common law cause of action for wrongful discharge based on a violation of public policy. *Swihart v. Pactiv Corp.*, 187 F.Supp.2d 18, 25 (D.Conn. 2002). Wrongful discharge is a narrow exception to the rule that contracts for employment at will are terminable at the will of either party without regard to cause. *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 474-78 (1980).   Under this doctrine, a cause of action is only recognized where the discharge contravenes a clear mandate of public  policy. 179 Conn. at 474.   *See also Burnham v. Karl and Gelb, P.C.*,  252 Conn. 153, 159 (2000)  ("In *Sheets*," the Connecticut Supreme Court "recognized a common law cause of action in tort for the discharge of an at will employee if the former employee can prove a demonstrably *imprope*r reason for dismissal, a reason whose impropriety is derived from some important violation of  public policy.") (emphasis in original)

(quoting *Carbone v. Atlantic Richfield Co.,* 204 Conn. 460, 466-67 (1987))*; Mirto v. Laidlaw Transit, Inc.*, No. 334231, 1993 WL 137627, at *2 (Conn. Super. Ct. April 20, 1993) ("[t]he doctrine of wrongful discharge, which provides that an employer may be liable for discharge of an at will employee in cases where the discharge contravenes a clear mandate of public policy, is a narrow exception to the general rule that contracts of permanent employment or for an indefinite term, are terminable at will.") (citing *D'Ulisse-Cupo v. Bd. of Dir. of Notre Dame High School*, 202 Conn. 206, 211 n. 1 (1987)).

In general, under Connecticut law, in order to state a claim for common law wrongful discharge in violation of public policy, a plaintiff must: (1) plead that the alleged conduct by the employer contravenes public policy and (2) demonstrate that the plaintiff is "*otherwise without remedy* and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." *Burnham*, 252 Conn. at 159-60 (emphasis in original) (quoting *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn.App. 643, 648 (1985)).

It thus follows that if a plaintiff's termination violated a public policy embodied and protected by statute, the claim for common law wrongful discharge is precluded. *See, e.g., Burnham*, 252 Conn. at 162 ("The existence of this statutory remedy precludes the plaintiff from bringing a common-law wrongful discharge action based on an alleged violation of § 31-51(b)); *Swihart*, 187 F.Supp.2d at 25 (Because "plaintiff already ha[d] an adequate statutory remedy" for employer's discriminatory practices under Title VII, the Court would "not recognize a separate claim for wrongful discharge in violation of public policy"); *Thomas v. Saint Francis Hosp. and Med. Ctr.*, 990 F.Supp. 81, 90 (D.Conn. 1998) (holding it "fatal" to plaintiff's claim that there was "the availability of redress for defendant's alleged discriminatory conduct under federal and state

11

antidiscrimination laws"), *aff'd*, 198 F.3d 235 (2d Cir. 1999) (Table); *Sherman v. Sedgwick James of Connecticut, Inc.*, No. CV 326150, 1997 WL 83714, at * 2 (Conn. Super. Ct. Feb. 10, 1997) (granting defendant's motion to strike wrongful discharge count based on the public policy of preserving an employee's right to petition the government where plaintiff alleged an additional count for a violation of § 31-51q).   In sum, if  "a relevant state or federal law contains a private right of action which serves to protect the public policy allegedly violated, a wrongful discharge claim will fail." *Nanos v. City of Stamford*, 609 F.Supp.2d 260, 268 (D.Conn. 2009) (citation omitted).[10]

Conversely, if there is a distinct and alternative theory of liability, related to a public policy that is *not* protected by state or federal statute, a wrongful discharge action may proceed. *See, e.g., Van Kruiningen v. Plan B, LLC*,  485 F.Supp.2d 92, 96 (D.Conn. 2007) (plaintiffs' wrongful discharge actions, alleging discharge in retaliation for reporting casino manager's activities in serving alcoholic beverage to minor, not precluded where policy underlying their claims – "not serving alcohol to minors" – was "distinct" from the policy underlying their claims under Title VII

---

[10]   Contrary to Plaintiffs' assertions, Connecticut courts have carved no "alternative pleading" exception to the requirement that a plaintiff must be  "*otherwise without  remedy"* to proceed with a common law wrongful discharge claim. In that regard, Plaintiffs' reliance on *Schumann v. Dianon Systems, Inc.*, 304 Conn. 585 (2012) is misplaced.   In *Schumann*, the Connecticut Supreme Court ruled that a pathologist's statements made in the course of his employment duties did not constitute constitutionally protected speech actionable under Conn. Gen. Stat. § 31-51q.  Only upon reversing judgment of the trial court, and thereby dismissing the § 31-51q claim,  did the Court allow "a new trial limited to the plaintiff's common-law wrongful termination claim." 304 Conn. at 627.  In fact, the Connecticut Supreme Court noted that the trial court had not allowed the jury to consider the wrongful discharge claim after it reached a verdict in plaintiff's favor on the § 31-51q claim.  *See id.* at 595 n. 11 ("Pursuant to the jury charge, the jury did not reach the common-law wrongful termination count after finding in favor of the plaintiff on the count under § 31–51q.").   Nowhere in *Schumann* did the Court address whether the two claims might have properly proceeded to judgment *simultaneously – i.e.*, whether the wrongful discharge action might have proceeded in light of the § 31-51q claim.

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 – "protecting against sexual harassment in the workplace"); *Iosa v. Gentiva Health Servs., Inc.*, 299 F.Supp.2d 29, 34 (D.Conn. 2004) (former employee's claim of wrongful discharge in violation of public policy not precluded by availability of a statutory remedy for retaliation under the Connecticut Worker's Compensation Act, Conn. Gen. Stat. § 31-290a, because retaliation claim did not embrace all of the public policy arguments in employee's wrongful discharge claims).

In particular, Connecticut's Superior Courts have consistently held that a plaintiff may recover under a theory of wrongful discharge, notwithstanding a contemporaneous claim under Conn. Gen. Stat. § 31-51q, where the basis of the wrongful discharge claim is a public policy for which the plaintiff is without remedy. *See, e.g.*, *Trimboli v. Von Roll Isola USA, Inc.*, No. NNHCV094037507S, 50 Conn. L. Rptr. 399, 400, 2010 WL 3341504, at *1-2  (Conn. Super. Ct. Aug. 3, 2010) (denying motion to strike where wrongful discharge claim was based on public policy of preserving employees' physical welfare and safety while additional § 31-51q claim was based on public policy of protecting employees' free speech); *Fedor v. New Samaritan Corp.*, No. CV074026586, 45 Conn. L. Rptr. 714, 718, 2008 WL 2553010, at *5-6  (Conn. Super. Ct. June 9, 2008) (denying defendant's motion to strike plaintiff's wrongful discharge claim notwithstanding additional allegation of violation of § 31-51q where discharge retaliated against employee for  good faith report of potential criminal conduct in workplace); *Mirto v. Laidlaw Transit, Inc.*, No. CV 334231,  9 Conn. L. Rptr. 19, 21, 1993 WL 137627, at *2-3 (Conn. Super. Ct. April 20, 1993) (denying motion to strike wrongful discharge claim based on the public policy of providing safe and adequate transportation of children to public schools, notwithstanding additional claim of  violation

of § 31-51q, based upon the preservation of free speech).

## B.   Conn. Gen. Stat. § 31-51q

Pursuant to section 31–51q of the Connecticut General Statutes, one may seek recovery for discharge from employment in retaliation for the exercise of protected speech.[11]   "In order to demonstrate a violation of [Conn. Gen. Stat.] section 31–51q, a plaintiff must prove that: (1) he was exercising rights protected by the first amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) he was fired on account of his exercise of such rights; and (3) his exercise of his first amendment (or equivalent state constitutional rights) did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer." *Kennedy v. Coca-Cola Bottling Co. of New York, Inc.*, 170 F.Supp.2d 294, 299 (D.Conn. 2001) (citing *Lowe v. Amerigas, Inc.*, 52 F.Supp.2d 349, 359 (D.Conn.1999), *aff'd*, 208 F.3d 203 (2d Cir. 2000) (Table)). *See also Winik–Nystrup v. Mfrs. Life Ins.* Co., 8 F.Supp.2d 157, 159 (D.Conn.1998)*; King v. Connection, Inc.*, No. CV106015682S, 2011 WL 3211250, at *5 (Conn. Super. Ct. June 20, 2011).

To prevail on a claim under Conn. Gen. Stat. § 31-51q, the content of the plaintiff's speech

---

[11] Conn. Gen. Stat. § 31–51q, captioned "Liability of employer for discipline  or discharge of  employee on account of employee's exercise of certain constitutional rights," provides in pertinent part:

> Any employer . . .  who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages.

14

must have been constitutionally protected. *Kennedy*, 170 F.Supp. 2d at 299. "To be protected by the first amendment, the plaintiff's speech must have been on a matter of public concern, and the plaintiff's interest in expressing himself on the particular matter must not have been outweighed by any injury the speech could cause to the employment relationship." *Id.* (citing *Cotto v. United Techs. Corp.*, 48 Conn.App. 618, 630 (1998), *cert. granted in part*, 245 Conn. 915 (1998), *aff'd*, 251 Conn. 1 (1999)).

Claims concerning such matters as illegal use and sales of drugs in the workplace and issues of workplace safety have been accepted as matters of public concern. *Kennedy*, 170 F.Supp. 2d at 299. Such matters are "not matters of purely private concern relating solely to the plaintiffs' employment" but "[r]ather . . . concerns regarding criminal activity in the workplace and safety issues that would affect the entire workplace and potentially the public." *Id.  See also Lowe,* 52 F.Supp.2d at 359 (holding that an employee's complaints about the improper storage of a hazardous substance implicated matters of public concern and, thus, constituted protected speech).

In order to determine whether the employee's speech at issue is protected by the statute, the threshold issue the Court must resolve  is whether the employee's speech simply concerns matters between the plaintiff and his or her employer, which is not protected, or whether such speech relates to  matters of public concern.   *See, e.g.*, *Lowe*, 52 F.Supp. 2d at 359 (distinguishing between "opinions on customer service, employee attitudes, racial remarks by other employees, inventory control problems, and training" as "clearly related to matters between plaintiff and [the employer]" and   "safety concerns regarding the improper storage of a hazardous substance such as propane," which "implicate matters of public concern and, thus, constitute protected speech").

C.    **Allegations in the Present Action**

In the case in suit, to determine whether Plaintiffs' common law wrongful discharge claims are precluded by their "free speech" claims under Conn. Gen. Stat. § 31–51q, the Court must determine whether the bases of Plaintiffs' common law wrongful discharge claims include any public policy for which Plaintiffs are otherwise without remedy.[12]   In the consolidated case at bar, Plaintiffs allege that they were wrongfully terminated by Burris in violation of Connecticut's "free speech" statute, Conn. Gen. Stat. §31-51q, in retaliation for the complaints they voiced regarding wage violations, safety problems, and sexual harassment.  No. 3:12cv1039, Doc. #1, at ¶ 56; *see also* No. 3:12cv1041, Doc. #1, at ¶ 61; No. 3:12cv1044, Doc. #1, at ¶ 77; and No. 3:12cv1045, Doc. #1, at ¶ 74.  Plaintiffs further claim that Burris "has exhibited a pattern of retaliating against employees who have asserted protected rights, including employees who have complained of being shortchanged in their wages, employees who have complained of safety issues, and employees who have brought workers' compensation claims."   No. 3:12cv1039, Doc. #1, at ¶ 57.  *See also* No. 3:12cv1041, Doc. #1, at ¶ 62; No. 3:12cv1044, Doc. #1, at ¶ 78; and No. 3:12cv1045, Doc. #1, at ¶ 75. They incorporate these paragraphs by reference into both their common law wrongful discharge claims in Count Two and their statutory claims under Conn. Gen. Stat. § 31–51q in Count Three.

Plaintiffs maintain that Burris simply employed the water main break as a pretext "to cover its true motivations for their dismissal on February 21, 2012 – *i.e.*, retaliation for Plaintiffs' complaints regarding "wage violations," "safety problems," and "sexual harassment."   No.

---

[12]  With respect to common law wrongful discharge, the Court must determine whether the speech at issue relates solely to problems existing between an employee and his/her employer, a private concern, or implicates a broader, public concern.  Only if the Court finds that the employer's conduct contravened public policy does it then determine whether a wrongful discharge action is precluded by a statutory remedy.

3:12cv1039, Doc. #1, at ¶56; No. 3:12cv1041, Doc. #1, at ¶61; No. 3:12cv1044, Doc. #1, at ¶77; and No. 3:12cv1045, Doc. #1, at ¶74. The Court will thus examine the three bases proffered by Plaintiffs as the underlying motivating factors for their termination, including whether Plaintiffs will otherwise be *without remedy* if not allowed to pursue their common law wrongful discharge claims.

### 1.   <u>Wage Violations</u>

In the case at bar, Burris allegedly discharged Plaintiffs in retaliation for complaints about "wage violations" under Burris's "malleable time management system." No. 3:12cv1039, Doc. #1, at ¶¶ 10, 34-39. In particular, Plaintiffs have alleged that they were inadequately compensated for work performed and complained to Burris supervisors and/or the general manager at the Rocky Hill warehouse regarding such payment issues. *Id.*

As to wage violations, courts within this District have repeatedly held that a common law wrongful discharge claim based on complaints regarding an employer's failure to fully compensate its employees is precluded by available statutory remedies. In *Felekey v. Am. Tele. & Tele. Co.*, No. 3:02–CV–691 (CFD), 2004 WL 2958468, at *4 (D.Conn. Nov. 3, 2004), plaintiff brought a common law wrongful discharge action, alleging that his termination was "wrongful in that said action violated the public policy for timely payment of full wages and compensation or benefits earned for just services embodied in Chapter[s] [5]58, 814 and 814c of] the Connecticut General Statutes." 2004 WL 2958468, at *2. The defendant employer moved to dismiss the claim as precluded, arguing that "because Conn. Gen. Stat. § 31–72 provides a remedy for Felekey to recover the compensation he claims is owed, as well as double damages and attorney's fees, a common law claim for wrongful discharge based on a violation of the public policy for timely payment of full wages and

compensation cannot survive."[13] *Id.* at *3 (internal quotations omitted).

In response, plaintiff Felekey contended that, "although § 31–72 provide[d] a remedy for his lost compensation, it [did] not provide a remedy for [his employer's] wrongful actions, namely, *terminating his employment because he asked to receive that compensation*." *Id.* (emphasis added). The court, however, disagreed, concluding that the statutory remedy to recover the lost compensation precluded the common law wrongful discharge claim. In so holding, the court noted that "[t]he statutory remedy bars the wrongful termination action regardless of whether a plaintiff has taken advantage of the existing statutory remedy" and " even if the remedies provided by the statute are lesser or narrower than the remedies potentially available in a tort or contract action."[14] *Id.* (internal

---

[13] Conn. Gen. Stat. § 31-72, captioned, "Civil action to collect wage claim, fringe benefit claim or arbitration award," provides in relevant part:

> When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, . . . such employee . . . may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action.

[14]The Court is cognizant that various Connecticut Superior Courts have allowed wrongful discharge claims to proceed where employees claimed that they were terminated by employers to avoid paying wages or other compensation that *would have accrued. See, e.g., Leue v. Computer Sciences Corp.*, No. CV01811784, 2002 WL 521345, at *1 (Conn. Super. Ct. Mar. 15, 2002) ("a plaintiff may plead a wrongful discharge claim by alleging that the plaintiff was discharged so as to avoid the payment of other compensation that, if vested, *would have accrued*") (emphasis added); *Cook v. Alexander and Alexander of Connecticut, Inc.*, 40 Conn. Supp. 246, 248 (Conn. Super. Ct. 1985) ("By alleging that the plaintiff was discharged in order to avoid payment of bonuses and the vesting of thrift plan benefits, the plaintiff has sufficiently alleged a wrongful discharge within the contemplation of *Sheets*.").

Such cases are distinguishable, however, from the consolidated cases in suit in that Plaintiffs herein were allegedly discharged by Burris for complaints made regarding wage violations that *had already occurred*, such that the wages in dispute were already earned and hence potentially recoverable under Conn. Gen. Stat. § 31-72.

citations omitted)

In *Donahue v. Unisys Corp.*, Civ. No. H–89–670 (JAC), 1991 WL 537530 (D.Conn. Feb. 15, 1991), then District Judge Cabranes focused on the individual nature of the wage-related complaints to hold that a plaintiff's common law wrongful discharge claim should be dismissed as precluded by the available statutory remedy for wage claims, Conn. Gen. Stat. § 31–72. 1991 WL 537530, at *8. Judge Cabranes clarified that the fact that plaintiff was not simultaneously bringing such a statutory claim to recover her lost wages was not grounds to allow her wrongful discharge claim to survive. *Id.* Rather, failing to pursue one's statutory remedy was "precisely the kind of cause of action that the courts in this district have prohibited," *id.*, suggesting, in essence, that one may not circumvent the legislature's intent to create a delineated statutory remedy by bringing a common law claim for wrongful discharge.

In the case at bar, Plaintiffs allege that they were "paid utilizing a malleable time management system to provide [an] incentive for employees to work faster." Doc. #1, ¶ 9. They assert that "[t]he Defendant did not provide . . . a written document explaining this complex wage calculation system," but rather "orally represented" that their rate of pay would be "divided into three main categories: the Base Rate [*i.e.*, at least $12.00 per hour], the Incentive Rate, and the 13 Week Average Rate [based on the average Incentive Rate in the previous 13 week period]." *Id.*, ¶¶ 11-13, 29 (internal quotations omitted). They claim that the Defendant failed to pay at least the Base Rate for every hour, failed to pay the Incentive Rate for "performing assignments faster" than the "Estimated Standard Time," which was calculated based on numerous relevant factors to the project, and "routinely paid the Base Rate for work which should have been paid at the 13 Week Average Rate." *Id.*, ¶¶ 15-36. As the result of various alleged "unauthorized reductions in pay,"

19

Plaintiffs "made frequent complaints" after realizing they were "shortchanged." *Id.*, ¶ 37. Defendant allegedly often failed to correct the miscalculated pay. *Id.*, ¶ 38. Plaintiffs also maintain that "the Defendant was particularly defensive [about] complaints of workers' pay being shortchanged because there was a campaign to unionize the facility." *Id.*, ¶ 40. Lastly, Plaintiffs allege that they were terminated on February 21, 2012 in retaliation for, *inter alia*, "making complaints of wage violations." *Id.*, ¶ 58.

Under the present circumstances, the Court is persuaded by the *Felekey* and *Donahue* opinions that Plaintiffs' wrongful discharge claims, to the extent that they are based on an underlying public policy against wage violations, are precluded by the available statutory remedy of Conn. Gen. Stat. § 31-70, *et seq.*, which authorizes an employee to bring a civil action to recover wages when an employer fails to properly compensate that employee.[15] Under that statute, "[i]n case of a dispute over the amount of wages, the employer shall pay . . . all wages, or parts thereof, conceded by him to be due, and the *employee shall have all remedies provided by law*, including those under said sections as to recovery of any balance claimed." Conn. Gen. Stat. § 31-71d (emphasis added).

The fact that Plaintiffs have not asserted claims for wages has no bearing on the issue of preclusion.[16] It is the existence of the statutory remedy that precludes a plaintiff's public policy

---

[15] Under the statute, "wages" are defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." Conn. Gen. Stat. § 31-71a.

[16] The Court notes that plaintiff Jonathan Valdes included an action for discrimination and retaliation in violation of the Connecticut Workers' Compensation Act, Conn. Gen. Stat. §31-290a, *et seq*. No. 3:12cv1045, Doc. #1 (Count 5). If he were to solely "rely on the public policy of prohibiting employers from retaliating against employees who exercise their rights under the worker's compensation statutes, his wrongful discharge claim[] would be barred because [he] has an adequate statutory remedy under Conn. Gen. Stat. § 31–290a." *Iosa v. Gentiva Health*

wrongful discharge claim, regardless of whether he or she has  availed himself of the statutory remedy. *See, e.g., Donahue,* 1991 WL 537530, at *8 (where plaintiff asserted that in her wrongful discharge claim she was not seeking to also recover wages under the relevant wage statute, Conn. Gen. Stat. § 31–71a to 71i, but merely citing it to articulate Connecticut's public policy against the withholding of wages, court dismissed her wrongful discharge claim, holding, "she has a statutory remedy under that statute [Conn. Gen. Stat. § 31–72 (1987)]" and "[t]he fact that she is not pursuing that remedy and, instead, seeks a remedy under a theory of wrongful discharge, is precisely the kind of cause of action that the courts in the district have prohibited").

Furthermore, if Plaintiffs' wage complaints to Burris supervisors and/or management were purely inquiries into their own individual wages, such inquiries would fail to  raise matters of public concern under Conn. Gen. Stat. § 31-51q.  As then District Judge Cabranes explained in *Donahue*, "plaintiff's inquiry into her own raise was a matter of purely private concern." Put simply, "[t]he fact that Connecticut provides that an employer shall not withhold any part of the wages of any person, Conn. Gen. Stat. Ann. § 31–70 (West 1987), does not transform a question about the amount of one's paycheck into a matter of public concern." 1991 WL 537530, at *8.  "In the employment context, it is indeed difficult to conceive of a matter that is more private than making inquiries about one's own salary." *Id.*  Therefore, Donahue's concerns about the size of her paycheck – "while no doubt raising serious matters for plaintiff herself—simply [did] not . . . raise matters of public concern sufficient to bring [them] within the protection of section 31–51q of the Connecticut General

---

*Services, Inc.*, 299  F.Supp.2d  29,  34  (D.Conn. 2004) (citing *Menard v. People's Bank*, No. CV970544627S, 1998 WL 177536, at *2 (Conn. Super. Ct. Apr. 6, 1998)).

Statutes."[17]  *Id.   See also Urashka v. Griffin Hosp.*, 841 F.Supp. 468, 474 (D.Conn. 1994) (§ 31-51q,

by its own terms, protects only those rights guaranteed by the first amendment and the first

amendment "does not protect speech on purely private matters, such as the terms and conditions of

one's employment").

In sum,  Plaintiffs' common law wrongful discharge claims, to the extent they are  based on

complaints  regarding wage violations, fall outside the statutory provisions of Conn. Gen. Stat. § 31-

51q if these complaints  pertain solely to Plaintiffs' individual wages.  One's own wages are a matter

of *private* concern and § 31-51q affords protection to speech relating to a matter of *public* concern.

Moreover, Plaintiffs' wrongful discharge claims, with respect to an overall public policy against

wage violations, are precluded by Connecticut's statutory remedies to recover wages, as set forth at

Conn. Gen. Stat. § 31-70, *et seq.*  These "wage violations" wrongful discharge claims  present no

distinct and alternative theory of liability  that is *not* protected by state or federal statute.

### 2.  __Workplace Safety__

With respect to the underlying public policy of workplace safety, Plaintiffs claim that they

were terminated in retaliation for "making safety complaints."  *See, e.g.*,  No. 3:12cv1039, Doc. #1,

at ¶ 56.  They also allege a particular incident of unsafe water and ice removal on the day preceding

their termination.  According to Plaintiffs, on February 20, 2012, Burris supervisors Xavier Gomez

and Christopher Costa requested that volunteers "help remove water from the warehouse" that had

covered the warehouse floor when a water main broke.  *Id.*, ¶ 42, 45-46.  On that date, "a great deal

of water turned to ice in the freezer area of the warehouse." *Id.,* ¶ 43.  Removal of such water

---

[17] Finding  no matter of public  concern raised by  plaintiff's inquiry into her wages,  the
court dismissed her action under Conn. Gen. Stat. § 31-51q.  *Donahue*, 1991 WL 537530, at *3.

"seemed unsafe" in that "[t]he scope of the spill resulting from the broken water main was larger than any spill at the facility previously, and the Plaintiff (and many other employees) did not have rubber boots to walk through the spill." *Id.*, ¶ 49.   Moreover, "[t]here were an insufficient number of squeegees to remove water from the Defendant's warehouse." *Id.*, ¶ 51.

Thereafter, a supervisor named Dexter Lee allegedly ordered Plaintiffs to chip ice from the freezer area of the warehouse. *Id.*, ¶ 52.  Two of the four plaintiffs, Lopez and Lester, noted to fellow employees that the water spill was dangerous but complied with Lee's request to chip ice. No. 3:12cv1039, Doc. #1, at ¶¶ 49, 53; 12cv1041, Doc. #1, at ¶¶ 54, 58.   Plaintiffs Montalvo and Valdes, however,  refused to chip ice based on their concerns about safety and belief that such chipping was not within their job descriptions.  No. 3:12cv1044, Doc. #1,  at ¶ 67; No. 3:12cv1045, Doc. #1,  at ¶ 65.  Montalvo and Valdes explained to  supervisor  Lee  that they preferred not to chip ice  in  the  freezer  because  their  steel  toed  boots,  which  were  mandatory  for  their  lift  operator positions,  did not have any spikes or grips to prevent the soles from slipping on the ice.   No. 3:12cv1044, Doc. #1, at ¶ 68; No. 3:12cv1045, Doc. #1, at ¶ 66.   Instead of being given alternate work  assignments,  Montalvo  and  Valdes  were  instructed  to  "punch  out"  for  the  day.    No. 3:12cv1044, Doc. #1, at ¶¶ 72-74; No. 3:12cv1045, Doc. #1,  at ¶¶ 68-71.  The following day each of the four  Plaintiffs were each terminated based on their alleged failure to assist in the removal of water from the warehouse. No. 3:12cv1039, Doc. #1, at ¶ 54; No. 3:12cv1041, Doc. #1, at ¶ 59; No. 3:12cv1044, Doc. #1, at ¶ 75; and No. 3:12cv1045, Doc. #1,  at ¶ 72.

In *Parsons v. United Tech. Corp.*, *Sikorsky Aircraft Div.*, 243 Conn. 66, 86 (1997), the Connecticut Supreme Court explicitly recognized a public policy requiring an employer to provide a safe workplace for its employees.   In reliance on the safe workplace public policy, the court

23

reinstated and thus allowed the plaintiff employee's claim for common law wrongful discharge in violation of public policy.[18]

On September 12, 1990, Gary F. Parsons, an aircraft maintenance instructor, was assigned by his employer, the Sikorsky Aircraft Division of United Technologies ("Sikorsky"), to instruct several members of a Bahrain helicopter crew regarding the proper repair and maintenance of a helicopter in Bahrain.   At that time "the United States of America and certain allied nations, including Bahrain, were involved in a joint military action, known as Operation Desert Shield, taken in response to the Iraqi invasion of Kuwait." 243 Conn. at 69.  In light of this  operation, on August 16, 1990, the United States State Department had  issued  a travel advisory, advising all Americans to defer all non-essential travel to Bahrain due to the  military action in the Persian Gulf region.  *Id.*

---

[18]*See also Thibodeau  v. Design  Group  One  Architects*, LLC, 260 Conn. 691, 700 (2002) (recognizing holding in  *Parsons* that wrongful discharge claim may be predicated on violation of public policy which requires employer to maintain reasonably safe workplace for employees), *Anderson v. United Way, Inc.*, No. NNHCV116017085, 2011 WL 7272445, at *3-4  (Conn. Super. Ct. Dec. 27, 2011) (denying motion to strike plaintiff's wrongful discharge claim where claim was based on Connecticut's "clear and defined public policy" requiring employers to provide a safe workplace for their employees, as set forth in *Parsons*, 243 Conn. at 79);  *Balog v. Shelton Restaurant, LLC*, No. CV040084313S, 2004 WL 1965919, at *5 (Conn. Super. Ct. Aug. 2, 2004) (recognizing that "[i]n *Parsons*, the court determined that the public policy expressed by the provisions of General Statute § 31-49 'gives a Connecticut employee a cause of action for wrongful discharge against an employer . . . if the employee is discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm ...' *Parsons* . . . , 243 Conn. at 80."); *Wells v. Town of Plainfield*, No. CV020068211, 2003 WL 1787971, at *3-6 (Conn. Super. Ct. Mar. 24, 2003) (denying motion to strike wrongful discharge claim based on public policy regarding safe workplace under *Parsons*;  plaintiff police officers alleged constructive discharge where one was not allowed to remove his blood-soaked uniform and other was forced to work with a malfunctioning radio or no radio, subjecting both officers to substantial risk of death, disease or serious physical harm); *Webster v. Pequot Mystic Hotel, LLC*, No. 556799, 2002 WL 173154, at *3-5 (Conn. Super. Ct. Jan. 10, 2002) (citing *Parsons* to deny motion to strike wrongful discharge claim with respect to public policy of ensuring "safe workplace" where plaintiff hotel managers  alleged they were discharged by their employer due to "their firing of an individual who posed a serious threat to the physical safety of at least one co-worker and her unborn child").

at 69-70.  The military installation to which Parsons was to be sent was serving as the main staging

area for the allied warplanes that were based in Bahrain. *Id.* at 69.

On September 18, 1990, Parsons informed Sikorsky by a written memorandum that he

refused to travel to Bahrain "because of the perceived threat to his health, safety and welfare,

evidenced in part by the State Department travel advisory and in part by news reports about the

situation in the Persian Gulf region generally." *Id.* at 70.  Within two hours following that refusal,

Sikorsky terminated Parsons's employment and removed him from their premises under security

escort. *Id.*

Parsons  thereafter commenced an action in state court, including, *inter alia*,  a common law

wrongful discharge claim based upon Sikorsky's alleged violation of public policy regarding an

employer's duty to provide a safe workplace for its employees.  At trial, the court struck Parsons's

wrongful discharge claim, dismissing it for failure to state a claim.

On appeal,  the Connecticut Supreme Court reinstated the claim as viable,  finding a public

policy violation in light of state statutory law which required employers to maintain a reasonably safe

workplace for employees.[19] *Id.* at 79-80 (citing, *inter alia*,  Conn. Gen. Stat. § 31–49 and Conn. Gen

Stat. § 31–370).[20]  The Court specifically noted that Conn. Gen. Stat. § 31–49, in conjunction with

Conn. Gen. Stat. § 31–370, "reflect a broad legislative concern for the physical welfare and safety

---

[19]   The  trial court  also  struck Parsons's claims for intentional and negligent infliction of
emotional distress, but the Connecticut Supreme Court affirmed the trial court's judgment as to those
two counts.

[20]   Under Conn. Gen. Stat. § 31–49,  "[i]t shall be  the  duty of  the  master to exercise
reasonable care to provide for his servant a reasonably safe place in which to work."  Similarly,
Conn. Gen Stat. § 31–370(a) provides that "[e]ach employer shall furnish to each of his employees
employment and a place of employment which are free from recognized hazards that are causing or
are likely to cause death or serious physical harm to his employees."

of Connecticut employees." 243 Conn. at 80. These statutes, and the public policy that they

evidenced, led the *Parsons* majority to conclude that Connecticut employees may bring "a cause of

action for wrongful discharge against an employer . . . if the employee is discharged for refusing to

work under conditions that pose a substantial risk of death . . . or serious injury." *Id.* In recognizing

this public policy exception to the employment-at-will doctrine, the court explained that "it requires

little analysis to perceive that the legislative purpose underlying [safe workplace legislation] would

be substantially undermined if employers were permitted to discharge employees simply for

protesting working conditions which they reasonably believe constitute a hazard to their own health

or safety." *Id.* at 80 (citation omitted).[21]

In the case in suit, Plaintiffs allege that they were terminated in retaliation for making safety

---

[21]    The *Parsons* court elaborated on its holding as follows:

[W]e are not holding that an at-will employee can contest his or her discharge based
on a subjective belief that an employer's directive would pose a threat to the
employee's health and safety. It remains the burden of the employee who contests his
or her discharge as a violation of the safe workplace public policy to prove that the
condition or situation in which the employee was directed to work posed an
objectively substantial risk of death, disease or serious physical harm. Similarly,
although we do conclude that the plaintiff has carried his burden of pleading that he
was discharged in violation of the safe workplace public policy, we do not hold that
the plaintiff has carried his burden of proving either that his discharge was based on
the defendant's violation of the safe workplace public policy, or that his proposed
relocation was not contemplated within the scope of his duties as an employee of the
defendant. We conclude only that, given the widely known perilous state of the
Persian Gulf region at the time of the plaintiff's discharge, along with our mandate
that pleadings be construed broadly rather than narrowly, the allegations presented
in the plaintiff's seventh revised amended complaint are sufficient to make out a
claim that the plaintiff was wrongfully discharged in violation of the public policy
requiring employers to provide a safe workplace.

243 Conn. at 86-87.

complaints and were in fact discharged on the day following the dangerous water main break.  Under the circumstances of the water main break, common sense and human experience dictate that requesting Plaintiffs to clean up and/or remove water and ice at Burris's refrigerated warehouse, without the aid of proper equipment and footwear, could have posed a significant threat to Plaintiffs' safety and welfare.  Thus, as in *Parsons*, "the [P]laintiff[s'] complaint[s] clearly alleged facts that, taken as a whole and considered in the light most favorable to the [P]laintiff[s], are sufficient to establish that [they were] terminated for refusing to follow an employer's directive that would have posed a serious threat to [their] health and safety and that was not contemplated within the scope of [their] employment duties." *Id.* at 85–86.

In sum, reading the Complaints in the light most favorable to Plaintiffs, one could surmise that Burris subjected its employees to an unreasonably dangerous condition  by directing them to remove water from the warehouse floor with squeegees and/or chip ice from the freezer area without rubber boots or other adequate footwear, possessing soles with spikes or grips to prevent them from slipping.  In response to Plaintiffs' failure to comply with this directive and/or complaints regarding such unsafe workplace conditions, Plaintiffs were allegedly terminated in violation of public policy.  Under *Parsons*, Plaintiffs have stated viable claims for wrongful discharge in violation of public policy.[22]

Plaintiffs' "safe workplace" wrongful discharge claims present a distinct and alternative

_____

[22] Plaintiffs allege that they were terminated "on the pretext of" refusing to assist in removing the water from the warehouse on February 20, 2012, when the true reason was retaliation for, *inter alia*, making safety complaints.  No. 3:13cv1039, Doc. #1, ¶ 56.  These safety complaints may have encompassed both the water and ice removal of February 20, 2012, and other safety problems not explicitly detailed in the Complaint. *See, e.g., id.*, ¶ 49.  The Court herein finds the incident regarding removal of the water and ice on the date of the water main break sufficient to constitute an unsafe workplace condition for purposes of this Ruling.

theory of liability, related to a public policy, that is *not* protected by state or federal statute. *See, e.g.*, *Balog*, 2004 WL 1965919, at *5 ("*Parson*s did not recognize, either explicitly or implicitly, an independent cause of action grounded in a violation of § 31-49. . . . [T]he public policy embodied in § 31-49 sets a standard by which workplace safety may be measured that can be used to assess employer conduct in circumstances where an employer may be found liable *through another mechanism, such as a wrongful discharge claim*, a common-law claim for workplace injury not covered by the Workers' Compensation Act or administrative enforcement by the labor commissioner.") (emphasis added). Accordingly, Plaintiffs' wrongful discharge claims may proceed to the extent that these claims are based on Burris's violation of "safe workplace public policy," including termination of Plaintiffs for "protesting working conditions which they reasonably believe[d] constitute[d] a hazard to their own health or safety." *Parsons,* 243 Conn. at 80 (citation omitted). Defendant's motion to dismiss Plaintiff's wrongful discharge claims with respect to workplace safety will be denied.

### 3. <u>Sexual Harassment</u>

Lastly, Plaintiffs claim that they were discharged in retaliation for complaints to Burris management regarding "sexual harassment." *See, e.g.*, No. 3:12cv1039, Doc. #1, at ¶ 56. With respect to an underlying policy regarding sexual harassment, that policy is adequately enforceable through statutory remedies, such as Title VII, 42 U.S.C. § 2000e, *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a–60, *et seq.*

District precedent dictates that, in light of existing statutory remedies, the public policy of preventing sexual harassment in the workplace does not warrant judicial recognition of an

28

independent cause of action. *See, e.g., Kilduff v. Cosential, Inc.*, 289 F.Supp. 2d 12, 18-19 (D.Conn. 2003) (female employee could not maintain wrongful discharge claim under Connecticut law, arising from violations of public policy against sexual harassment in workplace, in light of remedies available under anti-discrimination statutes for such violations; "[t]he wrongful discharge cause of action is not intended to be a catch-all for those who either procedurally or on the merits fail to establish a claim under existing discrimination statutes"); *Brosler v. Food Automation-Service Techniques, Inc.*, No. 3:96–2345 (DJS), 1997 WL 711438, *3 (D.Conn. Aug. 25, 1997) (dismissing plaintiff's wrongful discharge claim where she alleged that her employer's "unwelcome sexual advances [were] a condition of her employment" and her employer "discriminated against her [due to] her sex" because "federal and state civil rights statutes [Title VII and the CFEPA] provide[d] plaintiff with remedies for the wrongful conduct she allege[d]"). *See also Lucarelli v. Stop & Shop Co.*, No. 405521, 1999 WL 179620, at *3-4 & n.2 (Conn. Super. Ct. Mar. 10, 1999) (striking wrongful discharge claim where plaintiff alleged that she was constructively discharged in violation of the public policy of the State of Connecticut prohibiting sexual harassment in the workplace; plaintiff had statutory remedy under Conn. Gen. Stat. § 46a-60, and "a cause of action in tort for wrongful termination . . . exists only when a discharge violates public policy and the employee is otherwise without a remedy").

In the present action, to the extent that Plaintiffs contend that they were wrongfully discharged based on a public policy protecting employees from sexual harassment in the workplace, they have adequate statutory remedies available, Title VII, and Conn. Gen. Stat. § 46a-60. Plaintiffs cannot therefore maintain a common law wrongful discharge action on that basis.

## V.     <u>CONCLUSION</u>

In the consolidated case at bar, Plaintiffs have alleged common law wrongful discharge claims for termination by Burris in violation of public policy.  They have also brought claims against Burris for wrongful termination in violation of Connecticut's "free speech" statute, Conn. Gen. Stat. §31-51q, in retaliation for complaints they voiced regarding wage violations, safety problems, and sexual harassment.  Defendant has moved to dismiss the common law wrongful discharge claims as "legally insufficient on the ground that an alternate remedy exists under Conn. Gen. Stat. § 31-51q" and such a statutory claim "has, in fact been pled . . ."  Doc. #17, p. 1.

Under Connecticut law, Plaintiffs may state a separate claim for common law wrongful discharge in violation of public  policy, if they  (1) plead alleged conduct by the employer which contravenes public policy and (2) demonstrate that they are "*otherwise without  remedy* and that permitting the discharge[s] to go unredressed would leave a valuable social policy to go unvindicated." *Burnham*,  252 Conn. at 159-60 (emphasis in original).  Thus, a  plaintiff may recover under a theory of wrongful discharge, notwithstanding a contemporaneous claim under Conn. Gen. Stat. § 31-51q, where the basis of the wrongful discharge claim is a public policy for which the plaintiff is without remedy. *See, e.g.*, *Trimboli*, 2010 WL 3341504, at *1-2

Construing their Complaints in the manner most favorable to sustaining legal sufficiency, the Court has analyzed whether the alleged bases of the Plaintiffs' wrongful discharge claims include any public policy for which Plaintiffs are otherwise without remedy.  For all of the foregoing reasons, Defendant's motion to dismiss Count Two of each of Plaintiffs' Complaints is GRANTED in part and DENIED in part.   To the extent that the wrongful discharge claims are premised upon violation of the public policy regarding wage violations, those claims are precluded by Connecticut's

statutory remedies to recover wages,  Conn. Gen. Stat. § 31-70, *et seq.*, and are thus hereby dismissed.  Similarly, with respect to each wrongful discharge claim based upon the public policy against sexual harassment, available statutory remedies, *e.g.*, Title VII, and Conn. Gen. Stat. § 46a-60, bar those claims.

However, as to Plaintiff's wrongful discharge claims pertaining to the public policy against safety violations in the workplace, the Connecticut Supreme Court has recognized a "clear and defined public policy" requiring employers to provide a safe workplace for their employees. *Parsons*, 243 Conn. at 79-80.  Individuals may not bring private causes of action under Connecticut's state statutes mandating that employers maintain a safe workplace.  *See, e.g.*,  Conn. Gen. Stat. § 31-49.  Therefore, Plaintiffs may bring common law causes of action for wrongful discharge against their former employer Burris where Plaintiffs allege that they were discharged for complaining about, and/or refusing to work under, conditions that were inherently unsafe.  The hazards of wet or icy surfaces, causing dangerous slips and falls, are clearly sufficient to pose substantial risks of serious physical harm or even death.

Plaintiffs' wrongful discharge claims, as  based on the public policy of preserving safety in the workplace, seek to redress a separate and unremedied  wrong from their § 31-51q claim, based on the public policy of protecting employees' free speech.  Accordingly,  Defendant's motion to dismiss Count Two as it pertains to the public policy of workplace safety is DENIED.

It is SO ORDERED.

Dated: New Haven, Connecticut
       July 3, 2013

                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        SENIOR UNITED STATES DISTRICT JUDGE

31